MAURAN v. The H. B. FOSTER.    See Case No. 6,290.

---

## Case No. 9,310.

### MAURAN v. WARREN et al.

[2 Lowell, 53.] [1]

District Court, D. Massachusetts.  Aug., 1871.

AFFREIGHTMENT — CHARTER-PARTY — STIPULATION —PORT OF NECESSITY—COMMISSION—AGENT CREDIT FOR DRAWBACK.

1. In a charter-party made by a master of a vessel at a foreign port, it was stipulated, that, if the ship should put into a port of necessity, she should be consigned to the charterers or their agents, who were to pay disbursements, charging two and a half per cent commission on the amount, take care of the cargo, and have general charge of the business of the ship. Whether a master can lawfully bind himself to consign the vessel to any particular person in case of disaster, quaere?

2. Where, in a port of necessity, the master did put his vessel in charge of the charterer's agent,—held, the latter might properly require the master to produce his accounts when applying for money; such being the usage of the port.

3. Where the charterer had the funds ready, and kept them ready, to pay the disbursements, and the master broke off the negotiations and employed some one else, — held, the charterer might recover, as damages, the commission agreed on.

4. By the terms of the charter-party this commission of two and a half per cent was to pay for all the services of the agent, and he could not charge five per cent, though the usage of the port was to make that charge.

5. Where the charterer's agent was to have a commission on freight at the port of discharge, this is to be reckoned on the freight received, and not on the gross freight list, some of which could not be collected.

6. Where an agent, in accordance with a usage of business, receives back from the average adjuster a part of the amount charged for his services, he must credit his principal with the amount of such discount or drawback. An agent is not to receive payment from both sides; and a custom to do so would be void.

The libellant [Suchet Mauran, 2d], residing at Providence, R. I., was the owner of the ship Helen Clinton, of which S. C. Sprague was master, who, in August, 1868, being at Liverpool, chartered the ship to the respondents [George Warren and others], a firm doing business at Liverpool and Boston, for a voyage to the latter port. It was agreed, among other things, that the ship should be

1 [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

discharged by the charterers at Boston, who should collect the freight and averages, charging two and a half per cent commission on the amount; and that if the ship should put into any port before reaching her destination, she should be consigned to the charterers or their agents, "who are to pay disbursements, charging two and a half per cent commission on the amount of the same, take care of the cargo, and have general charge of the business of the ship." In the course of the voyage the vessel suffered damage, and was obliged to put back to Queenstown, where she was unloaded and repaired. The charterers were applied to by the master to furnish the money, and agreed to do so, and referred him to Messrs. James Scott & Co., of Queenstown, as their agents, who furnished him £200, and afterwards refused to make further advances. The agents testified that they were ready and willing, and offered, to make all necessary advances, if the master would send them his bills and accounts, as, according to their testimony, was the custom of the port in like cases. The master swore that the agents gave no reasons, but simply refused to let him have more money. There was a further conflict of evidence upon the question whether the libellant, who had gone to England on notice of the disaster, had made a new contract with the respondents varying the terms of the charter-party. This libel was brought to recover a balance of freight; and the respondents claimed the right to retain the commissions which they would have earned at Queenstown, if the master had been supplied with funds, &c., by them, and certain charges and commissions said to be due them at Boston.

F. Goodwin, for libellant.

1. The stipulation that the ship shall be consigned to the charterer's agent is ultra vires. The duty of the master at a port of necessity is to act on his own responsibility, for the benefit of all parties, and he cannot waive this right and duty. See Pope v. Nickerson [Case No. 11,274]; Hurry v. Hurry [Id. 6,922]; The Sir Henry Webb, 13 Jur. 639; Warren v. Skolfield, 104 Mass. 503.

2. We are not estopped, by suing on the charter-party, to set up that this charge is void, because, where an agent exceeds his authority, it is the excess only that is void. Story, Ag. §§ 166, 272.

3. The agents failed to perform the duties required of them.

4. If liable at all, it is only for two and a half per cent on the disbursements.

J. D. Ball, for respondents.

LOWELL, District Judge. In the case cited from the Massachusetts Reports, Warren & Co. acted merely as brokers, and the master appears to have given a gratuitous promise to consign the ship to them, which the court suggests is probably void. Here they

were charterers, and had a right to say where the vessel should discharge, and their commission was part of the consideration for the entire contract. I must confess, however, that I have considerable doubts whether a master can bind himself to put his vessel into the hands of the charterer's agents at a port of necessity. But in this case he made the assignment after the disaster, when he had a right to do so; and his action seems to have met the approbation of the libellant, so that no question of ultra vires arises. All that I have to decide is, why the contract was broken, and whether the respondents are entitled to any damages which they can recoup in this action.

Upon the preponderance of the evidence, it seems to me that the true account is that given by the Scotts; that the master refused to show his bills. This is the only theory that reconciles nearly all the evidence, and indeed all, if we suppose that the master has forgotten the reasons given for the refusal. It seems a reasonable and proper precaution for the consignees to take, and is sworn to be usual at Queenstown, to require the accounts to be exhibited; and the master ought not to regard it as any imputation on his honesty. I do not think it is shown that a new contract was entered into in this particular in the interview between the libellant and Mr. Warren. It is not likely that any such point should have been brought up; and the statement of Mr. Mauran appears to be rather of a result, as it rested in his mind after the interview, than of the words, or even the substance, of the conversation; and as the burden rests on him to make out this new contract, and as he is contradicted by Mr. Warren, and to some extent by the other respondents, I cannot hold that he has proved his new contract. Then the case is, that the respondents were ready and willing to furnish the money in the usual way, and, as they swear, kept it on hand for that purpose. It seems to me they are fairly entitled to the two and a half per cent on the disbursements. I remain of the opinion expressed at the hearing, that the true construction of the charter–party is, that they were to charge only this commission. There is evidence that five per cent would have been a reasonable charge, and was paid to the agent actually employed; but this cannot overrule the contract, which agrees for the lesser commission. The respondents undertake to divide the usual commission, and to charge one half of it as the commission on disbursements, and the other half for general care of the business; but the custom does not so divide it. If the usual charge had been two per cent, the libellants would still be entitled to two and a half; and so they are when it is five or more. The evidence that an additional two and a half per cent would be a reasonable charge for the general conduct of the business, is only an argument founded on the fact that five per cent is the usual charge at

Queenstown, and would be equally strong in favor of three, four, or five per cent, if they had been necessary to make up the usual charge at that port. If the case had been that the master applied to the respondents to do his business for the agreed commission, and they had insisted that they should charge the usual commission, he might well have refused to employ them, and would have had his action against them if he had been obliged to employ some one else at five per cent. It is only on this ground that the contract can be understood, or perhaps supported, at all. But the evidence does not show that this was the cause of quarrel, and, upon the whole, I think they are entitled to their two and a half per cent. This seems to me the true measure of damages for not using the money which was ready and waiting.

The respondents have charged precisely what Dawson, the agent who was applied to, and acted, did charge; namely, five per cent on disbursements, £25 for care of cargo, and one per cent for indorsing the draft drawn by the master on Baring Brothers, at four months, for the amount of the disbursements. The measure of damages for not fulfilling the contract and not employing the respondents ought not to include one per cent for indorsing a bill which they never indorsed. It may be that they were to be paid by a bill on a banker, but the libellant would have been at liberty to pay them in some other way. They might as well add the interest for four months, which, I suppose, was added to the draft. For a like reason it seems to me the £25 ought not to be charged. It was for services not rendered, and does not come into the damages for not employing the respondents.

Coming to the charges in Boston, I understand the questions raised to be,—1. Whether a commission is to be charged on the total amount of the general average loss, or only on that paid by the cargo and the freight. 2. Whether the commission is to be on the face of the freight bills, or only on the amount collected. 3. Whether the discount which the average adjuster allowed to the respondents from the face of his bill ought to be credited to the libellant, so far as his proportionate share is concerned.

The evidence is not sufficient to enable me to decide the first point to my own satisfaction. I do not know what part the respondents took in the adjustment, nor how these sums were in fact settled and collected. I will hear the case further on this point, if either party desires it.

The second point involves only a trifle, as I apprehend. The true rule is, that the libellant, by the terms of the charter-party, takes the risk of the solvency of the shippers; but if any freight cannot be collected, he is not to be charged a commission on it.

It is said to be usual for the adjuster to make some discount from his regular charge, for the benefit of the person who gives him

the business. This is common in many trades and callings; but it is plain that, when an agent receives such a drawback, he must credit his principal with it. It is, in fact, a deduction from the bill; and he who pays the bill is entitled to it. I have known this question to come up in various forms, and in different courts; but the result has always been the same. The respondents are to have their agreed compensation from the libellant for doing his business, and the expenses. If they can get any work done at less than the market rate, he must have the reduction. It is precisely as if the agent at Queenstown had received a commission from both sides, the libellant and the materialmen. I know this is often done; but no court could sanction it as against the principal, and I have not been instructed that any court ever did sanction it. The libellant's proportion of the discount must be credited to him. Interlocutory decree for libellant. Damages to be made up in accordance with this opinion.